**Billie Sol ESTES**
**v.**
**UNITED STATES of America.**

**UNITED STATES of America**
**v.**
**Billie Sol ESTES.**
**C. A. No. 2775; Cr. No. 66283.**

United States District Court
W. D. Texas,
El Paso Division.
May 18, 1966.

Harry Lee Hudspeth, Asst. U. S. Atty., El Paso, Tex., for the Government.

John D. Cofer and Hume Cofer, Austin, Tex., John P. Dennison, Pecos, Tex., Jack Niland, El Paso, Tex., for Billie Sol Estes.

BREWSTER, District Judge.

This proceeding involves a civil post-conviction motion seeking to vacate mov-ant's conviction in this Court on four counts alleging mail fraud and on one count charging conspiracy to commit mail fraud and the interstate transportation of fraudulent securities, and a motion for new trial in the criminal case itself on the ground of newly discovered evidence. The conviction was appealed and upheld. Estes v. United States, 5 Cir., 335 F.2d 609 (1964), cert. den. 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559, reh. den. 380 U.S. 926, 85 S.Ct. 884, 13 L.Ed. 2d 814. While there is only one pleading, it is expressly presented in the dual capacity just mentioned. The civil phase of the motion is based upon the claim that the government knowingly used perjured testimony to obtain the conviction, or that, if the government did not actually solicit such testimony, it knowingly permitted it to stand uncorrected. The motion in the criminal case alleges the recent discovery of evidence of a conversation in a long distance telephone call from Richard Feuille of El Paso to Hilbert Kreeger, Jr., of Wilmette, Illinois, of another conversation in a call from Harry Moore of El Paso to Kreeger, and of a letter dated December 12, 1961, from Kreeger to Robert Graham, an official of General Leasing of Fort Wayne, Inc., all of which evidence movant contends was theretofore unknown and unavailable to him and would now result in a verdict of acquittal.

The thrust of each part of the motion is that the new evidence will better enable movant to substantiate his defense that there could be no scheme to defraud, due to the fact that all of the parties [1]

---

1. The victims of the scheme were identified in the indictment as "mortgagors", "lessees" and "finance companies", which the indictment defined as follows: " 'mortgagors', who could be induced to execute promissory notes, chattel mortgages and conditional sale contracts for the purchase of tanks and related equipment from the SUPERIOR MANUFACTURING COMPANY of Amarillo, Texas, and the Lubbock Machine and Supply Company of Lubbock, Texas, and those persons and firms, hereinafter called 'lessees', who could be induced to enter into lease agreements for the lease of tanks and related equipment from General Leasing of Fort Wayne, Inc., and Leasing, Inc., both of Fort Wayne, Indiana, all of the said promissory notes, chattel mortgages, conditional sales contracts and lease agreements hereinafter designated as the 'paper', and those firms and companies, hereinafter designated as the 'finance companies', who could be induced to purchase the said paper * * *"

involved in the anhydrous ammonia tank transactions [2] knew that the tanks listed as security in their chattel mortgages or as rental property in their leases were fictitious, by establishing that Kreeger, a government's witness on the criminal trial, knew of the non-existence of the tanks at the time of the purchases by him of about $7,000,000.00 of tank paper for his employer, Walter E. Heller & Co., one of the "finance companies" listed in the bill of particulars as a victim of the scheme.[3] He also says that it shows that Kreeger perjuriously testified that he had no such knowledge and that he did not discuss tank transactions with J. C.

Williamson, one of the mortgagors or lessees, in a long distance telephone conversation in early December, 1961.

To a large extent, the same evidence is material to both aspects of the motion, and by agreement the entire matter has been tried in one hearing.

■ A detailed treatment of the civil action is made unnecessary by the concession of able counsel for movant [4] at the conclusion of this hearing that relief was not justified on that phase of the motion because of failure of the evidence to show any misconduct on the part of the government in connection with the

---

**2.** These transactions involving Billie Sol Estes' manipulations to get money on fictitious anhydrous ammonia tanks have come to be generally known in West Texas as "tank transactions", and all the written instruments connected therewith as "tank paper". Those designations will be used for convenience here.

**3.** Walter E. Heller & Co., of Chicago, was only one out of more than a hundred persons and firms listed in the bill of particulars as being among the mortgagors, lessees and finance companies who were victims of movant's scheme to defraud. The other finance companies were C. I. T. Corp., of Dallas and New York, Pacific Finance Co. of Los Angeles, Commercial Credit Corp., of Baltimore, Associates Investments, South Bend, Indiana, Pioneer Finance Co. of Detroit, First Acceptance Corp., Minneapolis, Kuykendall Investment Co., of Lubbock, Texas, Southwestern Investment Corp., of Amarillo, Texas, and Caprock Investment Co., Lubbock.

The names of 104 mortgagors or lessees were listed. That they represented only a fraction of the total number is evidenced by the following testimony given by movant in this proceeding:

"THE COURT: What I would like to ask while I am interrupting, to help me evaluate your testimony here, is do you have any idea about how many farmers were involved in transactions like these we have been hearing testimony about here, where they borrowed money, or where you borrowed money on non-existent tanks and—

"A I was trying to think last night. Done a lot of thinking. I don't now whether it was hundreds or thousands,

but would be hundreds, I believe. We had lots of them doing business.

"THE COURT: Do you have any idea about how much money was involved in these unsecured note transactions—the total amount of money—just a general idea about it—with all the companies?

"A Twenty-five million dollars, something like that."

The number of tank transactions exceeded the number of mortgagors and lessors. As is evident from the testimony in the present case regarding George Lutich, many of the hundreds of farmers were mortgagors or lessees in several separate tank transactions.

**4.** Movant is represented in this case by counsel selected and engaged by him. They are mature, able and zealous veterans of the courtroom on both the civil and the criminal sides of the docket. Mr. Dennison and the Messrs. Cofer have represented him at all stages of the proceedings relating to criminal matters against him since shortly after his arrest in March, 1962. One of those matters was the state court case tried in Tyler, Smith County, Texas, which went to the Supreme Court to become a landmark case on the televising of a criminal trial over objection of the defendant, Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and the other was a federal court case in Dallas, Texas, in which they obtained an acquittal. The El Paso lawyer was employed by movant in the latter stages of the preparation of the criminal trial under attack here; and, apparently, his only connection with the litigation involving movant has been with that case and this matter.

alleged perjury.[4a] The Court feels, however, that the seriousness of the charges here made and the existence of other reasons making the civil action untenable require it to record its own independent findings and conclusions on that action, at least in somewhat summary fashion. The Court finds, independent of the concession of counsel, that Kreeger did not give perjured testimony as charged; that no false evidence adverse to the movant was knowingly presented or allowed to stand uncorrected by the government; and that there was no willful or negligent failure on the part of the government to disclose any information that would have been helpful to movant. The evidentiary basis for the findings will appear in the discussion of the motion in the criminal case. Suffice it to say here that Kreeger

4a. The following occurred during the oral argument of Mr. John Cofer, chief counsel for movant:

"THE COURT: Let me ask you a question here. Right at the outset, your son, Mr. Hume Cofer, said in effect that he was satisfied from the evidence that the government had no knowledge of the Feuille telephone conversation at the time of this trial. He was also satisfied, or at least he anticipated that it would probably be found that they did not fail to use diligence in their investigation, any more than that you failed to use diligence. Now are you in agreement with him on that?

"MR. JOHN COFER: Yes, sir, I am in agreement.

"THE COURT: All right, go ahead.

"MR. JOHN COFER: I will say, Your Honor, when the petition was drawn, it was drawn because of the conversation with Mr. Fred Morton, which seems to be unequivocal, when he said that when they used Mr. Kreeger that he had doubts about whether he was telling the truth or not.

"THE COURT: Of course, the prosecutor is supposed to be a little bit skeptical, isn't he?

"MR. JOHN COFER: Yes, sir.

"THE COURT: He is not much good as a public servant unless he is skeptical about everything.

"MR. JOHN COFER: Yes, sir, but the prosecutor is supposed to represent not only the government in securing a conviction, all fairly and impartially, but he is also supposed to look after the principles, so if he had a doubt, he ought to say to the attorney for the defendant, 'I am using this witness because the government feels justified in doing it, but I have some doubts on it.'

"THE COURT: It would depend on the extent of his doubt.

"MR. JOHN COFER: I think that's right. But at that time, when this petition was drawn—you can't delay these matters. You have got to draw them immediately.

"THE COURT: Well, as I understand it now, after hearing the testimony, you are satisfied the prosecution had no actual knowledge of this transaction?

"MR. JOHN COFER: That's right.

"THE COURT: All right. Well, I wanted to be sure that matter was settled.

"MR. JOHN COFER: Of course, they don't have to have actual knowledge, if they are negligent, and I think the Court would be justified in saying they were not guilty of negligence.

"THE COURT: Well, now, that was the second point I had in mind. As I understand it from Mr. Hume Cofer's argument, he thought it was down to just the question of who had the better opportunity, or superior knowledge about it, and—

"MR. JOHN COFER: —I think you misunderstand—

"THE COURT: —And that he passed up the question of actual knowledge or negligence. Now that was the reason I was trying to get at this.

"MR. JOHN COFER: Well, I will say now that I don't think the Court should find negligence.

"THE COURT: All right.

"MR. JOHN COFER: I think that what Mr. Hume Cofer was saying was if you find that the government was not negligent and was diligent, then you simply have to find that we were diligent, because they had the better opportunity.

"THE COURT: Well, he didn't put any 'ifs' about it. Of course, he claimed I ought to find you all were diligent too; but I understand his argument to assume that the evidence shows that the government was diligent, so I was just trying to get down to the real issues.

"MR. JOHN COFER: I will say, Your Honor, that I don't think the evidence justifies relief under 2255. That ought to cover the whole thing. (Emphasis supplied).

"THE COURT: All right, go ahead."

was never even asked whether he knew that the tanks were nonexistent. Neither was he interrogated about the George Lutich transactions out of which the telephone conversation arose, or about whether he had any correspondence connected with the Williamson transactions, concerning which the letter of December 12, 1961, was written. Also, it is apparent that the letter refers to telephone calls between Kreeger and Graham, and not to a call between Kreeger and Williamson as contended by movant. Even if it did prove that Kreeger and Williamson actually discussed tank transactions in their telephone conversation, contrary to Kreeger's denial that they did, this item of testimony was just a drop in the bucket in this case that could not have affected the verdict.

■ It is fundamental that a conviction obtained by the knowing use of perjured testimony is in violation of due process of law under the federal constitution. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406 (1935); Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and Annotations in 2 L.Ed.2d 1575 and 3 L.Ed.2d 1991. The essential elements of an action to set aside a conviction on this theory are, first, that material perjured testimony was actually given, and, second, that the prosecution either knowingly used it or allowed it to go uncorrected. See also: Smith v. United States, 5 Cir., 252 F.2d 369 (1958), cert. den. 357 U.S. 939, 78 S.Ct. 1388, 2 L.Ed.2d 1552; Lott v. United States, 5 Cir., 262 F.2d 332 (1958); Sears v. United States, 5 Cir., 265 F.2d 301 (1959); Enzor v. United States, 5 Cir., 296 F.2d 62 (1961), cert. den. 369 U.S. 854, 82 S.Ct. 940, 8 L.Ed.2d 12; Tilghman v. Hunter, 10 Cir., 167 F.2d 661 (1948); Ryles v. United States, 10 Cir., 198 F.2d 199 (1952); Hickman v. United States, 8 Cir., 246 F.2d 178 (1957), cert. den. 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d

78; United States v. Branch, 2 Cir., 261 F.2d 530 (1958); Wilkins v. United States, 104 U.S.App.D.C. 337, 262 F.2d 226 (1958). The "prosecution" includes investigating officers as well as attorneys, and it is under an affirmative duty to make prompt disclosure of any information known to it which might have a material bearing on the truthfulness of any evidence adverse to the accused. Alcorta and Napue cases, both supra; Curran v. State of Delaware, 3 Cir., 259 F.2d 707 (1958), cert. den. 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353. The burden is on the movant to prove the essential elements of his action. Smith v. United States, Enzor v. United States, United States v. Branch, Ryles v. United States, all supra. Movant has failed to prove either one of the necessary elements of his civil action based on use of perjured testimony, and that theory of his action must be rejected.

Counsel for movant still strenuously insist that he is entitled to have his motion in the criminal case granted on the ground of newly discovered evidence. The Court is of the opinion that that motion should be overruled because: (1) The evidence regarding the long distance telephone calls in June, 1961, one between Kreeger and Moore and the other between Kreeger and Feuille, could have been discovered in time for use in the criminal trial by the exercise of due diligence on the part of movant and his counsel. Reno v. United States, 5 Cir., 340 F.2d 307 (1965); Ferina v. United States, 8 Cir., 302 F.2d 95 (1962), cert. den. sub. nom. Cardarella v. United States, 371 U.S. 819, 83 S.Ct. 35, 9 L.Ed. 2d 59; Pitts v. United States, 9 Cir., 263 F.2d 808 (1959), cert. den. 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535; Fernandez v. United States, 9 Cir., 329 F.2d 899 (1964). (2) The evidence is not such that it would probably produce a different result. Weiss v. United States, 5 Cir., 122 F.2d 675 (1941), cert. den. 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550, reh. den. 314 U.S. 716, 62 S.Ct. 478, 86 L.Ed. 570; Ledet v. United States, 5

Cir., 297 F.2d 737 (1962); Reno v. United States, supra.

A review of the facts is necessary to an understanding of the questions presented by this motion. Some of the background appears in the following quotation from the opinion of the Court of Appeals by Judge Grooms on the appeal in the criminal case:

"In short summary the evidence with some variation between the various transactions discloses that appellant, by himself or by agents, would approach various farmers and business men and persuade them to enter into conditional sales contracts, chattel mortgages and leases for the purchase or lease of specific, anhydrous ammonia tanks and related equipment from the Superior Manufacturing Company of Amarillo, Texas, and the Lubbock Machine and Supply Company of Lubbock, Texas. The tanks were described by serial number on the various instruments and were to serve as collateral thereto. These tanks did not exist but were represented to those with whom appellant and his agents had their dealings as being in existence and that they would constitute such collateral. After the instruments were executed they were sold and assigned to various finance and investment companies. A substantial portion of the money disbursed by such purchases was paid to appellant through his agents or through middlemen.

"Appellant and those associated with him paid to the parties executing the instruments a sum equivalent to ten percent of the face value of the instruments to induce them to execute the paper. For the same reason they also agreed to lease back from said parties the tanks and related equipment for a term of years co-extensive with the maturity of the paper, to pay the parties the same amount of monthly payments as they were required to pay as makers, and to save them harmless from having to pay out any of their own funds in making the payments required by the instruments. In some cases the makers of the instruments executed statements that the tanks had been delivered to them.

"Superior Manufacturing Company was under the domination and control of appellant and his co-defendants.

"The prosecution contends that the various transactions in all their ramifications constituted a gigantic scheme and conspiracy to defraud with the use of the mails to those ends. The counts upon which a conviction was had are so couched.

"More than $20,000,000.00 was involved in the purchase of Superior tank paper. Most of this is unpaid and in default." 335 F.2d at 612.

The fact that the tanks were non-existent was easy to conceal. Under the plan presented to the victims, it was contemplated that the tanks would go directly to the possession of movant, as lessee or as sub-lessee, for immediate use in his far-flung and widespread farming and fertilizer enterprises. Even though it was intended by movant and his co-defendants that the tanks would never be manufactured, Superior Manufacturing Company did currently make up and deliver to movant plates bearing serial numbers corresponding to those listed on the tank paper, so that they could be attached to some of his own tanks in the event of a check on the security. Movant actually owned 1500 tanks scattered over a wide area of West Texas to which plates could be attached to make it appear that any tanks listed on the paper actually existed.[5]

---

5. Douglas Lewsader, contract pilot for movant and for Superior Manufacturing Company, testified as a witness for movant on the criminal trial, and admitted on cross-examination that he flew boxes of tank serial number plates from Superior for delivery to Billie Sol Estes enterprises. He admitted that on the oc-

Counsel for movant say that they learned of the two telephone calls and the letter as a result of developments in the trial of a civil action in the state court in Pecos, Texas, at about the time movant was taken into federal custody in Janu-

casion of one of these deliveries, he knew two certain employees of the enterprises were changing plates.

Movant testified on this hearing:

"THE COURT: What became of them after they were manufactured— the plates with serial numbers on them?

"A What became of them after they were manufactured?

"THE COURT: Yes.

"A They were in our possession after they were manufactured.

"THE COURT: And what good would that do, the tank plate serial number, or the serial numbers on the tank plates? What good would that do the finance company?

"A What good would that do the finance company? Oh, like for example, Artie Baker there was just raising all kind of—they told him to go ahead and tend to his own business, that it wasn't none of his business, but he didn't do it. He just kept on stirring up a lot of—

"THE COURT: —I know, but how did the existence—

"A —*They were going to tell Mr. Baker the tanks did exist and they could prove that they did. And they would go see the tanks, and if they sent their auditor around, they did exist.* (Emphasis supplied).

"THE COURT: You mean by having a list of serial numbers?

"A By having a list of serial numbers, and putting them on tanks that were there in that valley. You see, I have about 1500 tanks. And say Mr. Powell got to raising a lot of trouble, just going to take him out and show him. I don't know why Mr. Powell entered into the deal.

"THE COURT: How would you put the plates on the tanks?

"A I don't know that. I don't know how they did that.

"THE COURT: Your testimony is that you had them there available to be put on tanks?

"A Yes, sir, that's right.

"THE COURT: If it came to a show-down, is that right?

"A Yes, sir, that's right. But Mr. Turiff knows that and Mr. Olpin knows that.

"THE COURT: Before we get away from that, you say 1500 tanks were actually in existence?

"A Right.

"THE COURT: In the valley. About how many tanks were listed on the paper?

"A But they were scattered all over the State of Texas, and I don't—I believe—

"THE COURT: —Well, what I am wondering about here, were there more than 1500? *If all the tanks that were described in this paper had existed, would that have exceeded 1500 in number?*

"A *If all of them had existed? Oh, yes, many times, I believe.* (Emphasis supplied).

"THE COURT: All right, go ahead.

"Q (By Mr. Hudspeth) Mr. Estes, some reference—

"THE COURT: —Excuse me, but I want to get the grasp of what he is saying here about these tank plates.

"The feeling was that if they had 1500 tank plates and plates to put on 1500 tanks with serial numbers on the plates, that that would be enough to cushion any inquiry? In other words, where there was somebody out making an investigation, they would wear him out trying to take him around to 1500 tanks, is that right, or do you know?

"A No, I don't know enough about the numbers to say.

"THE COURT: At any rate, the idea was—

"A —The idea—

"THE COURT: —Was to make a good enough impression on them that the tanks did exist to remove any doubt in their mind about the existence of them?

"A. Yes, that was their dealers and the competitors there."

When George Lutich, the lessee whose transactions are involved in the motion to set aside the conviction, went to movant in June, 1961, with the message that his banker in El Paso wanted him to get off the tank paper so that his credit would not be overextended, neither Lutich nor his banker knew that the tanks were non-existent, and therefore had not raised any such question at that time. Movant called the banker to reassure him that Lutich was not taking any chance in view of the sub-lease to movant and the guarantee of indemnity by Superior. In the course of telling about that call, he testified on this hearing: "I told Mr. Moore that I was in the fertilizer business and that *I could show*

ary, 1961, to begin service of his sentence. The Barnes group [6] filed the suit against Billie Sol Estes, Walter E. Heller & Co., and others to challenge the validity of their obligations under the tank paper signed by them. Walter E. Heller & Co. cross-filed against the Barnes group seeking recovery of the unpaid amount of the obligation evidenced by the tank paper they had signed. One of the issues in that case was whether Walter E. Heller & Co. knew that the security for the paper was fictitious. The Barnes group produced Feuille, George Lutich's El Paso attorney, and he testified that on June 17, 1961, he had his secretary

place a call from El Paso to Kreeger at his home in Wilmette, Illinois; that while he did not know Kreeger personally, a man answered the phone and identified himself as Kreeger; that he told Kreeger he was representing George Lutich who had signed some paper leasing some anhydrous ammonia tanks; that Lutich was not going to honor the paper; that "there was no consideration for the transaction in that the tanks were not delivered and were not expected to be delivered"; that in his opinion the transaction was bogus and fraudulent; and that he demanded the return of the paper signed by Lutich.[7] Kreeger, offered as a

*him tanks.* But mainly what I was trying to convince him was that I had given him a hold harmless letter on it. Given him a guarantee that I was going to pay for the tanks." (Emphasis supplied).

The acceptance of movant's scheme was made easier because of the practice in the oil fields over this West Texas area of "lend-lease" of equipment. This appears in the testimony of J. C. Williamson, a resident of Midland, Texas, and one of the victims of the scheme, where he said in this connection, " * * * (T)hat goes on in our business, the lend lease business, and we are not unused to it in the way of oilfield equipment, so it wasn't exactly a new idea, we have leased pumps ourselves."

The difference is, of course, that in the oil business the equipment actually existed.

Where the victims showed any reluctance, Billie Sol Estes sometimes furnished a financial statement that pulled them on in. He was having some difficulty getting Williamson over when, according to Williamson's testimony in the criminal case, the following happened:

"My C.P.A. went back, I stayed and talked to Mr. Estes, and my C.P.A. went back with his C.P.A., and *they showed him a financial statement of approximate worth of twenty million dollars, and he came out and told me that, and then I told him that if he had the financing I would agree to buy the tanks,* and at that time we signed the papers on the tanks, and Mr. Estes paid a ten percent commission on the actual amount of the note, Mr. Estes gave us a check for one-fourth of the value of the tanks, which we took back, and the financing was with C.I.T., we took back one-fourth of

the financing and the ten percent check." (Emphasis supplied).

6. The plaintiffs were designated as the "Barnes group" because they were members of the Barnes family by blood or marriage. They were members of the classes designated in the indictment as "mortgagors" and "lessees". There were only five of them out of the hundreds of mortgagors and lessees.

7. In view of the fact that the condition of the testimony makes it necessary for the Court to decide whether Feuille's statement of his opinion that the tanks had not been and would not be delivered related to all tank transactions generally or just to the George Lutich transactions, Feuille's testimony in the Pecos trial about the substance of the conversation is here quoted:

"Q (By Mr. Bankston) Go ahead. Tell what was said by and between you and Mr. Kreeger.

"A All right. As I said, I identified myself and was told by the person speaking on the phone that he was Mr. Hill Kreeger. I told him that I was calling on behalf of a client of mine, George Lutich, of Fabens who had at the instance of a man named Billie Sol Estes from Pecos, Texas, signed some commercial paper in favor of a company called Leasing Inc.; that I had been given to understand that his company * * * Walter E. Heller Company * * * was going to buy this paper. That I was calling to put his company on actual notice of the fact that there was no consideration for the execution of the papers by my client. That the execution of the papers appeared to have been based on fraud and that we wanted to put him and his company on notice of this, and notice of the

witness by Walter E. Heller & Co., testified that he had no knowledge of the nonexistence of the tanks during the time his company was buying the paper; that while it was remotely possible that

Feuille called him, he had no recollection of the call; that he believed he would remember Feuille's calling him at his home, as he did not get many long distance calls there.[8] A telephone bill of

fact that we were not going to * * * that my client was not going to honor the paper. And of course, I wanted to put him on actual notice * * * I told him I wanted to put him on actual notice of this fact. I went on to tell him that in my opinion, the whole transaction was a bogus fraudulent transaction, and that while I could well be laying myself open to a liable action by what I was saying, that I understood from my client that the documents covered tanks, the leasing of tanks from Leasing Inc. that had not been delivered by my client, that there was no intention that the tanks be delivered to my client, but that my client had received money for signing these documents and was not expected to receive the tanks. That in my judgment, the whole transaction was a fraudulent bogus transaction, and I wanted to put his company on notice of that, and of notice of the fact that there was no consideration for the transaction in that the tanks were not delivered and were not expected to be delivered. I asked Mr. Kreeger if he did have the Lutich documents, if they had bought them yet, and he told me in substance that he had them on his desk, that they had not bought them yet, and after some discussion he advised me that they would not * * * in view of what I had related * * * would not buy the paper. I thereupon asked him to return the papers to me, or at least to return it to my client in my care. I wanted the paper back. I said I didn't want it floating around where it could be negotiated to some other third party, against whom we might not be able to assert the defense of failure of consideration or fraud. Mr. Kreeger informed me that he could not return the papers to me directly, and I fussed a little about this. He said he thought I should understand that he would have to return the paper to the source from which he had gotten it, that he couldn't return it direct to me, but that they would not take it, and that he would return it to the source from which he had gotten it. That was the end and sum and substance of the transaction on the telephone."

\* \* \* \* \*

"Q Mr. Feuille, you learned according to whoever you talked to that the Heller Company had not purchased Mr. Luditch's (sic) papers * * * had not made the deal at all?

"A I was so informed.

"Q And you don't know anything to the contrary?

"A No, sir.

"Q And you don't know whether the Heller Company turned them down on account of Mr. Luditch's (sic) credit or why they might not have gone through with the deal?

"A All I know that Mr. Kreeger or the person who identified himself as Mr. Kreeger said that in view of what I had said that they would not buy the papers, and that they would return them to the source from which they came.

"Q Yes, sir. And what you said was that you understood there was some kind of fraud and Mr. Luditch (sic) had not received delivery of tanks?

"A That he was not expected to receive any tanks, yes, sir.

"Q And that he was paid money by Billie Sol Estes for signing the papers?

"A Yes, sir."

8. Kreeger's testimony in this connection on the Pecos trial was:

(Direct examination by counsel for Walter E. Heller & Co., when Kreeger was offered as a rebuttal witness)

"Q You are Mr. Hilbert Kreeger?

"A Yes.

"Q You have testified earlier in the course of this trial?

"A Yes.

"Q Mr. Kreeger, will you please tell, us, did you on June 17, 1961, or at any other time receive a telephone call from a lawyer in El Paso by the name of Feuille - F-e-u-i-l-l-e?

"A No, sir, I have no recollection of any phone call.

"Q Do you know the name Feuille at all?

"A I do not.

"Q Did he call you either in Chicago or Wilmette, Illinois, or any place else?

"A No, sir, he has not."

(Cross-examination by counsel for the Barnes group)

"Q The fact of the matter is that you did get a call from Mr. Feuille at your office or at your home on June 17, 1961, just as shown by him and as stated by him this morning, didn't you?

Feuille's law firm showing a charge for a call to Wilmette, Illinois on Saturday, June 17, 1961, and a piece of scratch paper from the firm's file on Lutich bearing handwritten notations of Kreeger's office and home telephone numbers, were introduced to corroborate Feuille's testimony.

Movant says that the investigation by his counsel of the George Lutich transaction following the Pecos trial also developed that on June 15, 1961, Harry Moore, Lutich's banker at the El Paso National Bank, had a long distance telephone conversation with Kreeger, wherein he told him that an attorney had raised some question about the consideration for the Lutich papers, and asked him to hold up any advance of money on the paper until the question was ironed out.[9]

Finally, the motion alleges that movant and his attorneys first learned of the letter of December 12, 1961, as a result of its having been offered in evidence by the Barnes group in the trial in Pecos. In answer to questions on cross-examination by defense counsel in the criminal case in El Paso, Kreeger testified that he had a telephone conversation with J. C. Williamson sometime in December, 1961, about a grain elevator;[10] that he had no

---

"A Well, sir, I believe June 17th was a Saturday and Heller Company was closed on Saturday and I didn't receive a telephone call from him at my home.

"Q Didn't you receive a phone call from Mr. Feuille either at your home at the number you gave us here, Alpine 1–7949, on that Saturday or at your office at Financial 6–2300.

"A No, sir, I didn't.

"Q Yes, sir, and is it that you just don't recollect Mr. Feuille's calling you in June, 1961?

"A Well, I don't recollect him calling me but if I got a telephone call at home, I think I would remember it.

"Q It could have happened and you just not remember it?

"A Well, sir, it is possible but I don't get many phone calls at home and I think I would remember it.

"Q But it could have happened and you just not remember it?

"A Anything is possible.

"Q And this is possible, isn't it?

"A Remotely."

9. Moore gave the following testimony in the present hearing about his long distance call to Kreeger:

"Q Or did he raise that question, that he had a sworn or notarized statement from Mr. Lutich that he had received the tanks and they were in existence?

"A The best I recall, *I said something in the mildest manner possible about the consideration* to Mr. Lutich, and he said he had a signed, notarized statement, but he still wouldn't make any advances." (Emphasis supplied)

* * * * *

"Q Did Mr. Lutich tell you the tanks did not exist?

"A No.

"Q Did you have any reason to believe that at all at the time?

"A No, sir."

* * * * *

"Q And at the time you had the discussion with Mr. Lutich, I believe you stated he showed you some documentation on these tanks deals, is that correct?

"A Yes, sir.

"Q Did Mr. Lutich tell you at that time that these tanks were non-existent?

"A No, sir.

"Q Did he tell you anything that would have led you to even believe that?

"A No, sir.

"Q As far as you knew at that time then, the tanks were somewhere, as far as you knew?

"A As far as I knew they were.

"Q Mr. Lutich didn't tell you anything to the contrary?

"A No, sir.

"Q What was the reason you wanted him to withdraw from these contracts, or take some steps in connection with it?

"A The bank financed Mr. Lutich's crop and had for several years. I was concerned about his becoming contingently liable in such a way that it would impair his borrowing ability at the bank.

"Q You advised him, I take it, to try to withdraw from the contract in some way, and this had nothing to do with any belief on your part that these were fictitious tanks?

"A No, sir, it had to do with this credit."

10. Williamson was actually involved in some grain elevator deals with Billie Sol Estes.

recollection of a discussion of tank transactions in that conversation, and believed there was none; that he did not make the statement to Williamson on that occasion that there was something fishy about the tank paper or the transactions.[11] Williamson, one of the lessees who had previously been offered by the government to establish his transactions with movant, was later recalled by the defense to contradict Kreeger's testimony. He said that they did talk about tank transactions; that Kreeger "lit into Billie Sol pretty heavy"; that Kreeger did use the words, "something fishy"; and that Kreeger said that his company was not going to take any more tank paper.[12] Movant admitted in this hear-

11. Kreeger testfied:

"Q Mr. Kreeger, did you ever have any conversations with Mr. J. C. Williamson?

"A Yes, sir.

"Q Did you have a telephone conversation with him sometime in December of 1961?

"A I believe that time is correct, sir.

"Q When he called you?

"A Yes, sir.

"Q Did you ever discuss tank transactions at any time, at that time or any other time, with Mr. J. C. Williamson?

"A I have no recollection of discussing tank transactions with Mr. Williamson.

"Q Did you discuss tank transactions on the occasion of that telephone conversation in December of 1961?

"A I believe not.

"Q Isn't it true that on that occasion Mr. Williamson discussed, brought up the subject of tank transactions, that he wanted you to take some more tank paper from him?

"A He did not.

"Q Isn't it true that on that occasion you said no and turned him down and that you said that 'there is something fishy about the tank paper'?

"A As I told you in the corridor, that is not correct.

"Q So that it is your testimony that you did not have a conversation with Mr. Williamson during which you told him, 'there is something fishy about the tank transactions'?

"A That is quite correct.

"Q But you did have a telephone conversation with him?

"A Regarding a grain elevator.

"Q That telephone conversation with him was prior to the time that you took the Barnes' paper and some other paper?

"A Yes, sir, that is correct."

12. Williamson testified:

"Q State whether or not, or tell me, it is true, isn't it, that you called Hilbert Kreeger for the purpose of talking about anhydrous ammonia tank paper?

"A Yes, sir.

"Q And for the purpose of signing some more of the Heller paper?

"A Well, not exactly that.

"Q Were you then willing to—had you decided that you would?

"A I had made arrangements with Billie Sol under great relutance to buy some more paper.

"Q Well, if you will, Mr. Williamson, state whether or not you had agreed and decided that you would sign some more paper?

"A Yes.

"Q And that would have resulted in additional commissions and money to you?

"A Well, it would.

"Q It would?

"A Yes, sir.

"Q And you called Mr. Kreeger about this paper?

"A Well, now—

"Q To discuss that?

"A Yes, I called Mr. Kreeger to discuss the paper.

"Q All right, sir. Now, isn't it true that on that occasion Mr. Kreeger told you that there was something fishy about the transactions?

"A He did, he lit into Billie Sol pretty heavy.

"Q Well, did he use that word, 'Something fishy'?

"A Yes. We talked about ten or fifteen minutes.

"Q Well, I will just ask you a couple of questions about that. Tell me also whether or not he said—just a minute—tell me also whether or not Hilbert Kreeger said on that occasion that Heller was not going to do any more business with Billie Sol Estes?

"A He said he wasn't going to take any more paper he didn't care who signed it.

"Q As a matter of fact, you knew that they did and they took some paper from your good friends, the Barnes, after that, didn't they?

"A Well, yes, they did, yes, sir."

ing that he was in Williamson's office during all of the conversation, and on an extension line listening to both parties during part of it. Movant says that the letter of December 12, 1961 [13], from Kreeger to Graham [14] corroborates Williamson's version of the conversation.

A brief resume of the George Lutich transactions is necessary at this point. Lutich was a prosperous farmer in the irrigated farming area of the Rio Grande Valley just below El Paso. His accountant, who was apparently hustling tank deals for movant, got him interested in them. He executed three separate sets of paper on May 10, 1961, whereby he leased from Leasing, Inc., of Fort Wayne, Indiana, a total of 486 one thousand gallon anhydrous ammonia tanks for a period of sixty months for a rental of $495,000.00, payable in equal monthly installments. Movant then leased the tanks from Lutich on the same terms as Lutich had rented them from Leasing, Inc. As further assurance that he would be protected against loss, Superior Manufacturing Company gave him a letter agreeing to take over the deal and hold him harmless "at any time that Mr. Billie Sol Estes should default on payment of said tanks." Leasing, Inc. was supposed to have bought the tanks from Superior Manufacturing Company. Lutich thought the tanks existed, but never expected them to be delivered to him. He thought they would go directly to movant's possession. Movant gave his check to Lutich for the ten per cent rake-off, and then stopped payment on it. [15] Lutich went to his banker, Moore, to inquire about the procedure for collecting on the check. The bank was financing Lutich's farming enterprises, and Moore frowned upon his becoming heavily obligated in collateral transactions. Moore told him to go to see his lawyer, Feuille, to see if he could get him off the leases. Moore did not suspect that there was any fraud in the transactions. His interest was in seeing that Lutich's borrowing ability at the bank was not impaired. Lutich did consult with Feuille, and Feuille's telephone call of June 17th to Kreeger followed. Moore's call to Kreeger was made two days before Feuille's. Kreeger stated in the telephone conversation with Feuille that the Lutich papers would have to be returned to the channels from which he had received them. Lutich then went to see movant in Pecos on June

13. "December 12, 1961
"Mr. Robert Graham
"General Leasing of Ft. Wayne, Inc.
"P. O. Box 2004
"Ft. Wayne, Indiana
"Dear Bob:
"Enclosed please find the complete documentation on the Williamson Petroleum Company transaction for ammonia tanks. As per our previous phone conversations we have declined purchase of this account.
"I am sorry that we cannot be of service in this instance.
 "Very truly yours,
 "WALTER E. HELLER
 & COMPANY
 "H. Kreeger, Jr.
HKjr:al "Assistant Secretary
"Enclosures
"P.S. Per Williamson's request he wants the documentation he signed sent back down to him.
 "H. K."

14. General Leasing of Fort Wayne, Inc., operated under the name of Leasing, Inc., until the name was changed in the summer of 1961. Robert Graham was one of the owners and was active in the operation of that company. The paper purchased by Walter E. Heller & Co. came to it through these companies. He was largely responsible for getting Walter E. Heller & Co. interested in purchasing tank paper. He was apparently in with Superior Manufacturing Company and Billie Sol Estes, as checks offered in evidence in the criminal case indicate he got a rake-off of three to four hundred thousand dollars.

15. The exact reason for this action is not clear. However, the check was given before the Lutich papers were acted upon by the finance company. An inference may be drawn from the facts proved that it appeared that there would·be some delay, if not some question, about the acceptance of the Lutich transaction, at least in the entire amount, and that movant stopped payment on the check until he knew the outcome at the finance company.

22nd. They spent three hours together, and movant had Lutich to his home for lunch. Lutich told movant of his problem with the bank, and asked for his help in getting his paper back. Movant called Moore from Pecos to El Paso, and tried to reassure him that Lutich was safe in signing the paper as movant "was going to be primarily liable for the leasing of the equipment." After failing to change the banker's mind, two typewritten letters dated June 22, 1961, were prepared for Lutich's signature, one addressed to Bob Graham of Leasing, Inc. and the other to Harold Orr of Superior Manufacturing Company, asking that the tank paper be returned to Lutich as he had decided to do his financing in another way. Each one of the letters acknowledged that the tanks had been delivered and were satisfactory. When movant and Lutich parted, movant remarked that he had given Lutich "more time than he would Harry Truman." An inter-office memorandum dated July 7, 1961, found in movant's files in the possession of the trustee in bankruptcy, from movant's office manager to movant, stated that Lutich had told him the night before "that he would keep things in good shape until something could be worked out." The paper was finally returned to Lutich in October, 1961, with a letter of transmittal on the letterhead of Billie Sol Estes Enterprises and purporting to be signed by movant, which contained the statement, "These contracts are being returned to you as they were not used."

■ The conclusion as to whether newly discovered evidence would likely produce a different result on a new trial must be reached by an evaluation of such evidence, not just in and of itself on a unit or a cumulative basis, but in the light of the entire record made in the trial on the merits and in the hearing of the motion for new trial. When the alleged newly discovered evidence is so reckoned up, it fails to meet the standard required for granting a new trial.

■ Even if the Court were to accept movant's theory that the evidence of the telephone calls and the letter goes to the extent of showing knowledge of Kreeger of the non-existence of the security from the time Walter E. Heller & Co. started purchasing tank paper, only that company's transactions would be eliminated.[16] There were nine other finance

---

16. This view is assumed only for the purpose of testing movant's argument on this point. The facts do not justify riding along this far with movant. The Court finds that the scope of Feuille's telephone conversation with Kreeger was limited to the George Lutich tank transactions reflected by the paper under consideration by Kreeger. Movant insists that the effect of Feuille's statements was that all the tank transactions were fraudulent. There is some testimony that might serve as a basis for such argument if it could be isolated from all the rest of Feuille's testimony and from all of the other evidence. Feuille, Moore and Lutich gave their respective versions of the Lutich transactions that involved the telephone calls of June 15 and 17, 1961. The Court is of the opinion that each one of them honestly and sincerely tried to give his best recollection about the transaction. Both Feuille and Moore emphasized several times that their recollections might not be too accurate about this transaction that occurred almost five years before this hearing in which they were testifying. Their demeanor, as well as that of Lutich, evidence their uncertainty even more. The testimony of each one contradicts the testimony of one or both of the others, as would naturally be expected under these circumstances, considering the lapse of time, what they have heard, pressure and other factors. Lutich and Moore did not know of the non-existence of the tanks in June, 1961, so Feuille could not have been informed of such non-existence by either one of them. There is no evidence that he knew of any other transactions at that time. He was calling Kreeger only to get Lutich's paper returned. There was no occasion for him to talk about other transactions. He understood from Kreeger that the papers had not been purchased by Walter E. Heller & Co., and that they would be started on their return through the channels from which they came to his company. As this matter was presented to him then, it was an isolated transaction where he got results rather easily by a telephone call. The blow up of the Billie Sol Estes enterprises did not occur for many months, and there was no occasion for Feuille to try to remember the con-

companies and over a hundred mortgagors and lessors. It would not follow that the mere fact that a jury was convinced that one or more of the finance companies had knowledge of the fictitious nature of the security would make them ignore the many individuals who were enticed to obligate themselves to an extent that would wipe out the life's savings of the most prosperous of farmers. It would be hard to conceive how a jury could conclude that a mortgagor or lessee like J. C. Williamson, for instance, signed papers obligating himself for a large sum of money with full knowledge that the security was non-existent. Such a conclusion would be inconsistent with the fact that he tried to make a thorough investigation, not just alone, but with the personal help of his C.P.A., before deciding to go into the tank transactions. The jury could believe that all the finance companies were in with movant on the scheme, and yet be more than justified in convicting on account of the swindling of any one or more of the mortgagors or lessees. This situation brings the question within the rule announced in Reno v. United States, supra, where the Court said:

"* * * Even assuming that Wright never transferred the money to appellant, appellant would not be exonerated, since the affidavits themselves establish that Wright received the money as appellant's agent and since receipt of the money was only one of several overt acts comprised in the conspiracy. And even expunging Wright's testimony in its entirety, there was an abundance of other evidence which fully established appellant's guilt." 340 F.2d at p. 309.

There is even less merit to movant's argument under the view the Court takes of what the facts are in this connection. Feuille's conversation with Kreeger was limited to the George Lutich transactions. A consideration of the conversation from the standpoint of Kreeger is necessary in determining the extent of knowledge imputed to him of even the Lutich transactions alone.[17] Lutich's banker had called him two days before. He mentioned only lack of consideration, and did not remotely suggest anything about fraud or non-delivery of the tanks. Kreeger then got the call from a man he did not know, who said Lutich would contest his obligation on the paper for lack of consideration, and who offered the opinion that the transaction was fraudulent because Lutich had not received delivery of the tanks and probably

---

versation. From all the evidence, reconciling the contradictions and taking into consideration the demeanor of the witnesses Feuille, Moore, Lutich and Kreeger, and the reasonableness of the different versions of their testimony here contended for, I find that the substance of Feuille's conversation with Kreeger is substantially that set out in the Court's summary of his testimony heretofore given in the body of this opinion.

17. The Court had the advantage of observing Kreeger as a witness in person on this hearing. While he made what lawyers would call a "poor witness", the Court did not get the impression that he was deliberately lying. He has a poor recollection, and an inclination to say that he does not remember something and not to maintain his ground when pressed by counsel. He is condemned by movant for his bad recollection. On the other hand, no one assails Feuille for the fact that he testified that he had never represented George Lutich before June, 1961, when the fact was that he had forgotten handling a tax matter for him. Allowances must be made for the facts that Kreeger must necessarily have had many telephone calls and voluminous correspondence in all phases, including credit investigations of the obligors, of the $7,-000,000.00 of transactions that went through his hands; that he must have been involved in many other financial transactions after the Billie Sol Estes bubble burst, as he continued work for his company that was doing hundreds of millions of dollars in financing transactions all over the world; that, as a young man in his thirties, he was under tremendous mental strain and pressure from having got his company involved in a scandalous transaction. The first time he was asked about the telephone call from Feuille was 3½ years after it took place. On this hearing, he was interrogated for the first time about details that occurred almost 5 years ago.

would not get them. To offset this statement of opinion or suspicion about the nondelivery of the tanks, Kreeger had before him at that time the signed statement of Lutich that the tanks had been delivered. It would be stretching it to say that such a conversation put Kreeger on notice of the non-existence of the tanks in the Lutich transaction; but there was nothing whatever about the statements made that imputed knowledge that the security in all the other transactions was likewise non-existent. There is nothing unusual about having some dispute over a few items where many similar transactions are being purchased, but that does not necessarily mean that all the apples are bad. If it were otherwise, it would be almost impossible to assemble a block of oil leases, for it frequently happens that there is a question about the validity of the title to one of the proposed component tracts when the titles to all of the rest are acceptable. The mere fact that the assembler of the block is notified that a deed to one small tract is forged does not mean that he is on notice that there is a question about the title to all the other unrelated tracts. So it was here. Kreeger got notice that there was a dispute over the legality of Lutich's obligation under his tank papers. He could and did send them back without being put in the position of having knowledge that all other tank transactions were likewise tainted.

The claim based on the letter of December 12, 1961, has no merit either. The mention of "our previous phone conversations" obviously refers to ones between Kreeger and Graham, the parties to the letter, and not to the one between Kreeger and Williamson, as contended by movant. The postscript, "Per Williamson's request he wants the documentation he signed sent back to him", does not indicate whether the request came to Kreeger in the telephone conversation between him and Williamson, or in some other manner such as being relayed through Graham's conversations with Kreeger. There is certainly nothing about the letter that would verify or indicate that Kreeger used the words, "something fishy", in his conversation with Williamson. In addition to being subject to all the other weaknesses already pointed out, the value of this item is seriously diminished by the time factor. The telephone conversation with Williamson occurred after Kreeger had been buying tank paper for his company for about seven months. The end for movant's enterprises was fast approaching. Kreeger could have had knowledge at that late date that something was fishy, and have been acting in good faith in purchasing the tank paper during the preceding months.[18]

Movant argues that the judgment in favor of the Barnes group in the case at Pecos is conclusive on the effect that this alleged newly discovered evidence would have in his criminal case. Only excerpts from the record in the Pecos case were offered on this hearing; but there are several obvious reasons why movant's contention is unsound. The parties and the issues are not the same in the two cases. The Pecos case involved only one finance company, five mortgagors or lessees, and a small number of tank transactions. Even if it were conceded in the criminal case that all of the parties in the civil suit had the knowledge contended by movant, there would still be many more victims of the scheme to defraud left in the criminal case entirely unaffected by that knowledge.

The movant further claims that the length of the jury's deliberations and their difficulty in arriving at a verdict show that it would not take much to tip the scales in his favor. From the record of the reports and the requests the

18. The claim that Kreeger said in early December, 1961, that there was something fishy about Billie Sol Estes' business and that he was not going to accept any more tank paper, no matter who signed it, cannot be reconciled with the fact that he later approved and bought for his company the Barnes group paper totalling hundreds of thousands of dollars.

jury sent to the court during their deliberations, it is evident that whatever difficulty they were having was due to a lack of understanding of the charge on the part of some of them. There is nothing to indicate that the only thing standing between movant and an acquittal on all counts was a determination of the question of knowledge on the part of Walter E. Heller & Co. of the non-existence of the tanks.

This question of the probability of a different result on a new trial is seen in its true perspective when movant's testimony on this trial and the developments in connection therewith are considered. The movant did not testify in the trial of the criminal case. He raised the question of knowledge of the non-existence of the tanks through the testimony of two of his former private pilots, Lewsader and Hartman. Lewsader was also contract pilot for Superior Manufacturing Company during the heyday of the tank transactions. He admitted flying boxes of plates, each bearing a serial number of a non-existent tank, to various locations for Superior and movant, and he knew plates were being changed on tanks owned by movant. Hartman also admitted such knowledge. He was further involved with movant in a scheme to manipulate cotton allotments of landowners in other states so that they could be improperly acquired and used by movant on his irrigated farms in the Pecos area. The combined effect of the testimony of those two witnesses was that one or the other of them was present when mention was made in the presence of each of the finance companies, and some of the mortgagors and lessees, that the tanks were non-existent. The testimony they gave in that trial corroborated movant's story given in this hearing about meeting Kreeger in person on two occasions and discussing the non-existence of the tanks with him. The movant, apparently recognizing that the testimony of his two implicated confed-

erates would be inadequate, through his counsel and his own testimony insisted that he would clinch the point by being a witness for himself on a new trial. He took the witness stand in this hearing to give the Court the benefit of what his testimony would be. He said that he discussed the non-existence of the tanks with Kreeger in two long distance telephone conversations in the first half of 1961, and in two personal meetings with him in May, 1961. Kreeger had testified on the trial of the criminal case that he made one trip to Texas in 1961 to acquaint himself generally with the type of farming in far West Texas and the general economy of that area, as his company had no background for passing on the new type of financing that was developing from farming on irrigated land fertilized with anhydrous ammonia. He gave a detailed itinerary of that trip that lasted about a week and took him from El Paso to Amarillo. He said that he and another representative of his company landed in El Paso on the night of May 23, 1961, rented a car and stayed all night there; that they went to Pecos on the afternoon of the next day and stayed there the night of May 24th; that they went from there to Seminole, to Plainview, to Amarillo, with stops in between. He mentioned going into the coffee shop at the Hilton Hotel while in Plainview. On this hearing, movant testified that Kreeger came to his home in Pecos by appointment around six o'clock on the morning of May 24th, and conferred with him about an hour; that they met again by appointment a day or two later in the coffee shop of the Hilton Hotel in Plainview for further talk about tank transactions; that on each occasion they discussed in detail the plan of the tank transactions, including the fact that the tanks would be fictitious. Hartman testified on the criminal trial that he was present at the conference in Pecos.[19] Lewsader said on that trial that he saw movant and Kreeger together in the cof-

19. He gave the year as 1960; but both parties agree that he meant 1961, as Kreeger did not make a trip to far West Texas in 1960. Hartman died in a mysterious plane crash during the criminal trial.

fee shop in the Hilton Hotel in Plainview. It was proved beyond any question that all of this testimony was perjury in the raw. The flight log of movant's private plane showed that he and his entire family left Pecos on that plane at 10:15 A.M. on May 24th and went to Dallas, where they took a Braniff plane to Washington, D. C. The hotel records established that they stayed there the entire week. A car rental contract signed at the El Paso airport showed that Kreeger and his companion flew into El Paso around 9:00 P.M. on May 23rd. Their hotel bills showed that they stayed all night in El Paso. Harry Moore testified Kreeger was in his office on the morning of May 24th. That was confirmed by a letter written on June 6, 1961, to Moore by Kreeger after his return to Chicago, which referred to their meeting on the morning of May 24th. A mercantile store receipt showed that Kreeger bought a tape for his dictating machine in El Paso on May 24th. Pecos and El Paso are about two hundred miles apart, and are in different time zones. When movant's plane left Pecos at 10:15 A.M., C.S.T., it was 9:15 A.M., M.S.T., in El Paso. It is obvious that Kreeger could not have been in El Paso during banking hours or during store business hours on the morning of May 24th and also have been in Pecos for the conference, as movant and Hartman swore he was. It is just as true that movant could not have been in Washington for a week beginning with May 24th, and have had the meeting with Kreeger in the Hilton Hotel coffee shop on May 25th or 26th, as movant and Lewsader said he did. These were lies from the whole cloth, trumped up by movant to try to fit into Kreeger's intinerary. They are the foundation for the whole claim that Kreeger had knowledge of the non-existence of the security. It now appears that movant also tried to bribe a witness to help him out on this defense. These facts would leave no question in a jury's mind about the fallacy of movant's claim as to Kreeger's knowledge, and about his guilt on the counts on which he was convicted.

Innocent men do not have to resort to perjury and subornation of perjury.

■■ The other reason why the motion should be denied is that the defense in the criminal case failed to use due diligence to discover the evidence in question. The bill of particulars put the defense on notice that George Lutich and J. C. Williamson were among the parties contemplated by the terms "mortgagors" and "lessors" used in the indictment. Movant was not interrogated by his counsel about the transactions involving George Lutich at any state of the preparation for the criminal trial. The movant did not give them the information he had about them. Each of the transactions was such as to make a lasting impression on movant. The problem with Lutich was serious enough that he gave him "more time than he would Harry Truman." The inter-office communication of July 6, 1961, indicates that he was having his office manager keep him posted on Lutich's attitude. He not only had a man whose banker was crowding him to get his paper back, but he had one who was holding checks for over twenty thousand dollars on which movant had stopped payment. Any discussion between counsel and movant would have led to an interview with Lutich and Moore, and in turn with Feuille. Counsel for movant say that Moore might have been reluctant to talk to them on account of the fact that he was trustee in bankruptcy in the Billie Sol Estes matter, and further that the connection of Feuille's firm with some of the civil litigation involving the tank paper would have made him hesitant to tell about his telephone conversation with Kreeger. Both Moore and Feuille are honest, reputable men. Their telephone conversations with Kreeger were not privileged. If Moore had been asked about his knowledge of the Lutich transaction, he would have disclosed it to counsel for movant. It was well documented by memoranda in his file. If Feuille had been asked by counsel for defendant about his call, they would have got the information about it. If movant had

told his counsel of his long distance telephone conversation with Moore in Lutich's presence, that would have been another lead to an interview with Moore about the Lutich transaction, and in turn to an inquiry of Feuille about his call. The Williamson transaction was likewise important enough to movant for him to remember it. He needed to get Williamson on some more paper. Movant claims Williamson called Kreeger about the possibility of getting financing. Movant was present during all of the conversation, and listened in on some of it. If Williamson gave a correct recollection of the conversation, as movant claims, then movant knew that Kreeger would not accept the Williamson paper he had, and that it would be returned. It seems only reasonable that if movant had made a full disclosure to his counsel of his knowledge of the Williamson transaction, that they would have asked Kreeger on cross-examination about the existence of any letters he might have written in connection with the return of that paper. When the question of due diligence is presented in connection with a motion for new trial based on newly discovered evidence, the court is not limited to a consideration of the knowledge and conduct of defense counsel alone. That question is decided on the basis of the composite knowledge and diligence of both the accused and his counsel. When the two are put together in this case, the conclusion is that the defense failed to use due diligence.

Counsel for movant seek to excuse their lack of inquiry into the Lutich and Williamson transactions by saying that they looked on the list in the bill of particulars only for those individuals whose names were connected with the letters described in the various counts. That is no justification. They knew that the persons alleged to have been defrauded by the scheme were not limited to those named in connection with the letters which figured in the misuse of the mails. They did think enough of the list to ask their witness Hartman about his ac-

quaintanceship with many of the persons named on it, including Williamson and Lutich, but that was the extent of their interrogation of anybody, in court or out, about the transactions involving those mortgagors and lessees. Due diligence required more.

The argument is made that the government and the movant stand on the same footing in this case when it comes to judging due diligence in the investigation; and that if the government was diligent, the movant was too. That contention overlooks the advantage of the superior knowledge of the movant, himself. The government's investigation was not limited to tank transactions. The "Billie Sol Estes Enterprises" covered a wide field of endeavor, scattered over a large geographical area. Government grain storage contracts and illegal cotton allotments were involved. There were, therefore, many facets of the investigation. It is only reasonable that many items of evidence, both large and small, might have been susceptible on their surface of more than one interpretation. The very nature of the matters involved required that the government make whatever investigation was necessary to determine the correct meaning. The movant knew most of those things without investigation. He certainly knew the significance of the more important transactions like those involving Lutich and Williamson.

The movant claims that the testimony of Fred Morton brings this case within the rule laid down in Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). The question is not close enough to require much discussion. Morton was an Assistant United States Attorney who actively participated in the prosecution of the criminal case. He was in the private practice of the law when this hearing was held. In this proceeding, he testified that during the criminal trial he had some doubts about Kreeger's testimony that he had no knowledge of the non-existence of the

tanks.[20] He said that such doubt was due to two things: (1) the inherent difficulty of proving knowledge of a negative thing; and (2) the fact that movant did actually have some tanks in his possession caused him to wonder whether some of them might have been ones covered by the tank paper. This witness was not in the courtroom at any time during this hearing except when he was giving testimony, and he therefore had no opportunity to observe the demeanor of the witnesses. Questions propounded to him by counsel for movant were based on an interpretation of the testimony of Feuille with which the Court does not agree. Questions asked him by counsel for movant also failed to distinguish between an incorrect statement and a deliberate falsehood by Kreeger. When his testimony is read as a whole, it shows that by the end of the trial he was convinced that Kreeger was telling the truth.[21] The following testi-

20. Fred Morton testified:
"MR. JOHN COFER: I have one other question that I would like to ask and then I will be through. Perhaps my memory is not good on this, Mr. Morton. You and I were discussing this when I was out here at the time and after I talked to Mr. Feuille for the first time, and I asked you in the office of the District Attorney if it wasn't a fact that at the time Kreeger testified you had doubts about him telling the truth about not knowing there was not any tanks, and do I recollect correctly that you told me, 'Well, yes, I had doubts just like you had doubts about him telling the truth?' And I said, 'Well, Fred, I knew he wasn't telling the truth.'

"Do you remember when we talked about that?

"A I recall having said that we had doubts about Kreeger, and I think it could safely be said, because of the difficult nature of the crucial question here, about almost everybody who testified, because—

"THE COURT: —You mean a doubt about whether they were telling the truth or not?

"A Well, let me explain it. When you ask a man, 'Did you know that there were no tanks?' you are asking him about knowledge of a negative thing. And how do you prove or disprove whether or not he had knowledge of something that did not exist. So we always felt one of the things that made the scheme successful, that these representations were made to them that there were tanks.

"Now then Mr. Estes definitely did have some tanks. It was difficult for them to know whether or not the ones they saw were theirs or not. When we asked somebody, 'Did you know there were no tanks', as I testified, no one ever said before Orr, Alexander and McSpadden admitted it that they knew there were no tanks.

"We tried to be as careful as we could to determine whether or not they actually did know there were no tanks, even though they told us that they didn't know it.

"Q The point I am making the Court did charge the jury that if the finance companies and their representatives who acted for them and the farmers knew there were no tanks, then they were parties to this transaction and that they could not convict the defendant but should say by their verdict not guilty. Now it became very material then as to whether or not Mr. Kreeger knew there were any tanks.

'And the question I asked you, and understood you to say, that even you had some doubt about whether or not Kreeger didn't know that the tanks didn't exist?

"A I couldn't prove it to myself one way or another, conclusively. I believed him when he said he did not know.

"Q But you did have a doubt?

"A Yes.

"MR. JOHN COFER: That is all.

"THE WITNESS: I had less doubt after the trial than I did before, though."

21. Fred Morton's testimony in this connection was:
"Q State whether or not, even though you may believe—first, I will ask you: Do you believe Mr. Kreeger told the truth on the trial of the Estes case in 1963?

"MR. HUDSPETH: We will object to the witness passing on the credibility of another witness.

"MR. JOHN COFER: Your Honor—

"THE COURT: —Just a minute. I will permit him to testify what he believed at the time of the trial when he put the witness on. I think you have

mony summarizing his feelings about Kreeger as a witness clearly shows that this case is distinguishable from *Mesarosh*:

"MR. JOHN COFER: No I don't want to argue about it. I think he was arguing with me. I am asking you about your opinion.

"A Let me state it this way. If I were Solicitor General I would not confess error in the Supreme Court because I would have such a doubt about Mr. Kreeger's credibility that it would be against my conscience as a representative of the Sovereign to allow the conviction to stand."

The Court did not get the impression that the doubt this witness mentioned in his testimony was ever substantial or reasonable. A fair and honest prosecutor ought to be skeptical about witnesses offered by him, in order to be ever alert to any developments that might affect the integrity of the trial. The main source of this doubt, weak as it was, has been cleared up in this hearing by the testimony of movant about the some 1500 tanks in his possession. He says that they were his own, and that all the ones listed as security on the tank paper were fictitious. There need be no worry now about the possibility that at least some of the tanks listed on the paper might have been actually manufactured and delivered to movant.

 ██ ██ not an unusual situation for the recollections of witnesses to differ. There would be no need to provide

a right to inquire whether he believed he was testifying to the truth. That is one of the issues.

"MR. JOHN COFER: Now—

"THE COURT: —Just a minute. Do you want him to answer that question? I said I would permit him to testify to his belief about whether he was testifying the truth when he put him on the witness stand, and down through the end of that trial. Do you want to ask him that?

"MR. JOHN COFER: No, I am not asking that question. I am asking him now—

"THE COURT: —Looking back?

"Q Looking back, if he believes Mr.

for triers of fact if there were no conflicts in evidence. An accused is entitled to demand and receive only a fair trial, not a perfect one. United States ex rel. Weber v. Ragen, 7 Cir., 176 F.2d 579, 586 (1949); State v. Smith, 119 W.Va. 347, 193 S.E. 573 (1937); State v. Case, 247 Iowa 1019, 75 N.W.2d 233, 240 (1956). That means that he has no ground to complain where his trial cannot withstand a post-conviction lint picking process trying to make constitutional questions out of small imperfections that could not possibly have affected the result. The trial of the criminal case under consideration here had no more conflicts, inconsistencies and mistakes in the testimony than would normally be expected in one of its length and complexity. There was nothing about them, however, that passed the "line of tolerable imperfection" and fell into "the field of fundamental unfairness".[22] The movant had a fair trial under the distinguished judge who presided in his criminal case. No improper advantage was taken of movant by the prosecution. The facts do not raise any question about the integrity of the criminal trial.

Judgment will be entered in the civil action denying and dismissing the petition to vacate the conviction. An order will be entered in the criminal case overruling the motion for new trial for newly discovered evidence.

This opinion will serve as findings of fact and conclusions of law.

Kreeger was telling the truth at that time?

"A I believe so."

\* \* \* \* \*

"MR. JOHN COFER: —What I am trying to get at is: Mr. Morton had the responsibility at that time—whether he now believes that Mr. Kreeger was telling the truth when he said that he didn't know the tanks were nonexistent, on this paper?

"A I believe he told the truth then.

"Q You believe he told the truth at that trial?

"A At the trial in this courtroom."

22. Curran v. State of Delaware, 259 F.2d, at p. 713.