**Marvin McKinley MORRISON,**

v.

**UNITED STATES of America.**

**No. CA 1–404.**

United States District Court,
N. D. Texas,
Abilene Division.

Oct. 10, 1969.

Eldon Mahan, U. S. Atty., Fort Worth, Tex., for the Government.

Marvin Morrison, pro se; Davis Scarborough, Charles Scarborough, Abilene, Tex., for defendant (petitioner).

## MEMORANDUM OPINION

BREWSTER, District Judge.

The petitioner's motion under 28 U.S. C. § 2255 seeks to vacate his conviction and sentence in this Court in CR. No. 1–98, United States of America vs. Marvin McKinley Morrison, et al. for aiding and abetting Joe Fredrick McDonald in robbing the President of the federally insured State National Bank of Big Spring, Texas, of $12,000.00 belonging to such bank by assaulting him and putting his life in jeopardy.

Prior to the beginning of the hearing, the petitioner filed a motion to disqualify the undersigned Judge on the ground of bias and prejudice. His counsel refused to join in the motion.[1]

The Judge against whom an affidavit of bias and prejudice is filed must pass upon the sufficiency of the affidavit, but not upon the truth or falsity of the facts alleged. He must ac-

---

1. This was in spite of the following statement by the Court to Mr. Charles Scarborough, one of defense counsel:

"Now, then, Mr. Morrison has filed a motion to disqualify me. Mr. Scarborough, when I appointed you, I advised you of the motion, and that you could join in it as, of course, I was not thin-skinned about those matters. I told you I would hear the motion objectively, and would consider it whether you did or did not join in it as required by the rules. I said I would consider it on the merits whether you signed it or not."

cept as true every allegation of fact made as a predicate for affiant's belief. Willenbring v. United States, 9 Cir., 306 F.2d 944 (1962); Albert v. United States District Court for Western District of Michigan, Northern Division, 6 Cir., 283 F.2d 61 (1960), cert. den. 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 706; Green v. Murphy, 3 Cir., 259 F.2d 591 (1958); Scott v. Beams, 10 Cir., 122 F.2d 777 (1941), cert. den. 315 U.S. 809, 62 S.Ct. 795, 86 L.Ed. 1209. When the affidavit of the petitioner is so tested, it is insufficient for each of the following reasons:

1. The allegations are conclusory in nature rather than factual. There are no allegations of adequate facts to support such conclusions. 28 U.S.C.A. Sec. 144, the statute under which affidavits of this kind are brought, says: "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists. * * *" In pursuance of this provision of the statute, it has been held that the reasons and facts for the belief of prejudice a litigant entertains are an essential part of the affidavit, and must give fair support to the charge of a bent of mind that may prevent or impede partiality of judgment, Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); Foster v. Medina, 2 Cir., 170 F.2d 632 (1948); Tucker v. Kerger, 7 Cir., 186 F.2d 79 (1950); and that statements in an affidavit of bias or prejudice against a trial judge which were couched in generalities and failed to recite the specific facts were insufficient. Simmons v. U. S., 3 Cir., 302 F.2d 71 (1962).

2. The Judge's bent of mind complained of in the affidavit is not shown to be a personal bias, extrajudicial in origin. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Tynan v. United States, 126 U.S.App.D.C. 206, 376 F.2d 761 (1967), cert. den. 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111; Hodgdon v. United States, 8 Cir., 365 F.2d 679 (1966), cert. den. 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676; Barkan v. United States, 7 Cir., 362 F.2d 158 (1966), cert. den. 385 U.S. 882, 87 S.Ct. 170, 17 L.Ed.2d 109; Wolfson v. Palmieri, 2 Cir., 396 F.2d 121 (1968); In re Union Leader Corp., 1 Cir., 292 F.2d 381 (1961), cert. den. 368, U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190. It was admitted at the outset of the hearing that whatever feeling the petitioner charged the judge had arose only from proceedings in the courtroom in connection with this case.[1a]

3. While the first and natural reaction of a judge to a motion questioning his ability to give a litigant a fair trial would ordinarily be to recuse himself, the rule is well established that it is a judge's duty to sit when no valid reason is given for his disqualification. Edwards v. United States, 5 Cir., 334 F.2d 360 (1964); cert. den. 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702; Tynan v.

---

1a. "THE COURT: (Addressing Counsel for Petitioner) Is there any possibility—have you found from him [petitioner] or any other source any possible basis for feeling that the Judge has any feeling about the case from any source outside the trial itself?

"MR. CHARLES SCARBOROUGH: No, Your Honor, I know of no extraneous, extrajudicial influence that could have or was asserted upon Your Honor, and from the defendant I learned of none.

"THE COURT: Did you go into that very thoroughly with him this morning?

"MR. CHARLES SCARBOROUGH: Yes, sir.

"THE COURT: Mr. Morrison, do you have in mind any source outside of the proceedings here in court where I learned anything about you at all, or have any feelings about you at all? Or were you talking about some opinion formed from what I saw and heard here in the courtroom? Which are you talking about?

"DEFENDANT MORRISON: I was speaking of what went on in the courtroom, Your Honor.

"THE COURT: Well, under the law that is not grounds for disqualification of a judge. If a man is qualified to be a judge, naturally he would form some opinion from the proceedings in court, and could not help it. I overrule the motion."

United States, supra; Rosen v. Sugarman, 2 Cir., 357 F.2d 794 (1966). Any other rule would result in a vicious cycle of judge shopping in criminal cases.

■ 28 U.S.C.A. Section 2255, shows that it is the established public policy of the federal government that collateral attacks on convictions should be heard, if possible, by the judge who imposed the sentence. He is in the best position to evaluate an attack from the legality and fairness of the trial. It stands to reason that in most cases a petitioner seeking to vacate his conviction would rather have some judge other than the one who presided at the trial of his case on the merits. If judges should readily recuse themselves without adequate justification, it would be an incentive to petitioners under Section 2255 to file affidavits of bias and prejudice.

Aside from all of the above, if there were the least question in my mind about my ability to give both sides in this case a fair trial, I would recuse myself without any motion. Such condition of mind does not exist.

The only ground set out in the motion is that the government used perjured testimony of Morrison's co-defendant, McDonald. A full evidentiary hearing that consumed most of three days has been held, with Morrison present. McDonald was also brought back from the penitentiary and testified at length. Able counsel was appointed for Morrison, but he dismissed them [2] in the middle of the trial for no reason at all and proceeded *pro se* with the help of the thirty pounds of "legal papers" he had brought with him from the penitentiary.

" * * * The essential elements of an action to set aside a conviction on this theory are, first, that material perjured testimony was actually given, and, second, that the prosecution knowingly used it or allowed it to go uncorrected. * * * The burden is on the movant to prove the essential elements of his action. * * * " Estes v. United States, D.C.W.D.Tex., 254 F.Supp. 314, 318 (1966), citing Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), Enzor v. United States, 5 Cir., 296 F.2d 62 (1961), cert. den. 369 U.S. 854, 82 S.Ct. 940, 8 L.Ed.2d 12, and numerous other cases. The Court is of the opinion that neither of such elements was established in the case *sub judice.* The government officials believed in good faith that the testimony given by McDonald on the criminal trial of Morrison was true, and it was in fact true. However, if the Court had anything like a reasonable doubt about whether McDonald's testimony on Morrison's trial was perjured, the petition would be treated as a motion for new trial based

2. Morrison, typical of the cunning convict who thinks he has mastered loophole law in the "writ classes" in prison, insisted on running his case from the beginning and discharged four good, conscientious lawyers when they did not agree with him. He had money when he was arrested, and employed Mr. George Thomas of Big Spring, Texas, a veteran criminal trial attorney, to defend him in the trial on the merits. Morrison fired him at the conclusion of the trial. The Court of Appeals appointed Mr. Theodore Mack of Fort Worth, Texas to represent Morrison on his appeal. Morrison and his fellow convict "legal eagles" then decided that an accused had a better chance to get his conviction set aside in a post-conviction hearing, and directed his counsel to move to dismiss the appeal. When Mr. Mack disagreed with them, Morrison wrote him a most abusive letter dated January 20, 1969, saying, "I do *not* need your assistance nor will I accept it", and threatening to "bombard the Court of Appeals" if he did not do as told. That letter is part of the file in Cause No. 26235, Morrison vs. United States, in the Court of Appeals. Messrs. Davis and Charles Scarborough, members of one of the long established Abilene law firms, were appointed to represent Morrison in this post-conviction proceeding. Either one of them was capable of handling it alone. Mr. Davis Scarborough is generally recognized as one of the leading trial lawyers in West Texas, and has had extensive experience in criminal cases. The Scarboroughs worked diligently and faithfully until Morrison dismissed them suddenly in open court without any prior indication of dissatisfaction with their services and announced that he was going to take over.

on newly discovered evidence, and the conviction would be set aside under Rule 33, F.R.Crim.P., in spite of the good faith of the government officials.

McDonald and Morrison were co-defendants in the same indictment. McDonald was charged with robbing the bank, and Morrison, with aiding and abetting him. McDonald was effectively disguised when he pulled the robbery, and Morrison masterminded it from the background; so law enforcement officers had no idea for some time as to the identity of the participants in the crime. McDonald went back to his home in West Virginia shortly after the bank job, and hijacked a supermarket there. He was apprehended, convicted and sentenced to 15 years. Probation in a prior conviction for burglary was revoked, and the sentence was made to run consecutively to the one for hijacking. McDonald decided to clean his slate. He sent for the F.B.I. and gave them the details on the bank robbery in Big Spring. That was the first information they had as to the identity of the persons involved.

McDonald pleaded guilty and was offered by the government as a witness in Morrison's trial. The effect of his testimony was that he committed the actual robbery, that Morrison masterminded it, and that they split the proceeds. There was strong corroboration of Morrison's involvement in the offense.

McDonald was a resident of West Virginia. After receiving his probated sentence in that State for burglary, he and a young girl friend went on a hitchhiking tour of the West in the latter part of 1967. Morrison gave them a ride on the road from Big Spring to San Angelo, Texas in November of that year, and invited them to move into his home with him in San Angelo. Morrison was going under the name of T. L. Raymond there. McDonald accepted the invitation, but the girl went back to Balti-more. Soon thereafter, Morrison moved to Midland, Texas, and rented a house; and McDonald moved with him. McDonald and Morrison spent most of their time travelling constantly over a wide area of Southwest Texas and the Mexican border during that period. There is no indication, even in the pre-sentence reports, as to where they were getting money to live on during that time. There has never been any claim that either one of them earned a dollar honestly [3] during the time they were together.

The bank was robbed on December 12, 1967. The robbery was planned by Morrison. He had lived in Big Spring, and knew the setup and layout of the bank from once having had a small account there. McDonald did not know the bank existed. He was never in it except the time when he pulled the robbery. Morrison had a 1960 Chrysler New Yorker; but when they reached a decision to do the job, they went to a car lot in Midland and bought an old 1957 Chevrolet Station Wagon for $250.00 for the sole purpose of using it for transportation in connection with the robbery.

When Morrison and McDonald left Morrison's house in Midland for Big Spring, 40 miles away, on the day of the robbery, McDonald was wearing a business suit which belonged to Morrison. The brief case and the pistol McDonald was to use in the robbery were also furnished by Morrison. McDonald's normally light brown hair was dyed black. Morrison drove him to a point less than a block from the bank. He had told McDonald that the President of the bank was a Mr. Currie who had a private office where they would not be observed. McDonald walked into the bank shortly before closing time carrying the brief case with the pistol in it, and asked for Mr. Currie. He told Currie that he was representing an oil company and would like to have the door closed

---

3. Morrison's pre-sentence report, in commenting on the lack of reliable information about his means of livelihood, mentions that, " * * * Reports from Leav-enworth state that they felt defendant would always try and make his living by gambling and 'shady activities'."

while he discussed some business with him. When the door was closed, McDonald pulled the pistol out of the brief case and demanded $60,000.00. Currie, with the pistol pointed at him all the time, dickered over the amount, and finally got McDonald down to $12,000.00 on the basis that the bank was small and the employees would become suspicious if they were asked to bring more than $12,000.00 cash into the office. He got $12,000.00 in $20.00 bills and surrendered it to McDonald. McDonald then told Currie to walk out of the bank in front of him to Currie's car.[4] McDonald, with the pistol in his belt and the money in the brief case, followed directly behind Currie as they went from the office to the car. Currie was instructed to drive to the Gibson parking area and did as he was told. McDonald had never been there before and had no idea where it was located. When they stopped at a place designated by McDonald after they reached the parking lot, Currie, under McDonald's instructions, got in the back and lay on the seat with his head facing the rear of the car. When the elderly gentleman got in position, McDonald beat him over the head with Morrison's pistol until he was in no condition to know what became of McDonald. Currie lay in the car stunned and bleeding when McDonald left. Morrison was waiting on the side of Gibson's store opposite from the place where Currie's car was parked. As McDonald approached, Morrison told him to get into the car and drive it across the street to the parking lot of the Veterans' Hospital. McDonald did, and Morrison followed on foot about 10

minutes later. Morrison walked by the car without stopping and told McDonald to change clothes. McDonald took off Morrison's suit and put on some Levis and an old shirt. He then drove to the other end of the parking lot and Morrison got into the car under the wheel. McDonald still had to wash the black dye out of his hair to make his entire appearance completely different from what it was during the robbery. Morrison called a cocktail waitress friend, and got her to leave her job to go let him and McDonald in her house. When she left to go back to work, McDonald washed his hair. At Morrison's direction, McDonald then got the suit out of the car and hung it up in a closet in the house. They left it there when they went back to Midland.

Morrison and McDonald gave Morrison's common-law wife [5] $1,000.00 of the loot for household expenses, and split the remaining $11,000.00 equally. They proceeded to get rid of the 1957 Chevrolet Station Wagon promptly by trading it in on a later model Pontiac and paying the difference in cash.

A few days before the robbery, Morrison had looked at a 1964 Ford Convertible in San Angelo, but did not have the money to buy it. On December 19, 1967, he had the necessary cash and closed the deal.

On Morrison's criminal trial, McDonald testified to most of the facts above set out. The only material change made in his recantation on the present hearing is that Morrison knew nothing about the bank robbery and had no connection with it. He now says that

4. Morrison's plan was for McDonald to have Currie bring him to the large parking area surrounding a big mercantile store (Gibson's) in a suburban area several miles from the bank. Morrison was to be waiting there to take McDonald away in the old Chevrolet Station Wagon. Morrison told McDonald to have the old man lie down in the seat when they stopped in the parking area, and beat him over the head with the pistol until he was unconscious. In that way, Currie would

never know that Morrison was involved or the kind of car in which McDonald was making his get-away.

5. This does violence to Texas' conception of the legal common-law marriage. It would probably be more accurate to say that Morrison and the woman were just living together in sin. She did think enough of him, however, to try to slip eight hacksaw blades to him while he was in jail in Abilene shortly before the trial. She went by the name of Dollie Raymond.

Morrison thought they were going to Big Spring on the occasion in question only for the purpose of taking some pills [6] to McDonald's prostitute girl friend who lived near the bank. That explanation just does not jibe with the admitted facts. It presents several questions for which there is no reasonable answer. Why would Morrison and McDonald buy the Chevrolet Station Wagon to make the trip to Big Spring just to take some pills to McDonald's girl friend? Why didn't they use the Chrysler Morrison already owned? Why would McDonald need to disguise himself to take pills to a girl who knew him well? How was McDonald to get to Gibson's parking area without Currie's car? Why was the meeting at Gibson's necessary? Why didn't Morrison give McDonald a few minutes to deliver the pills and pick him up near the girl friend's house? Why did they have to arrange for washing the dye out of McDonald's hair and to leave Morrison's business suit at the cocktail waitress' house rather than risk having it in the Chevrolet with them on the way back to Midland?

To look at the recantation from a slightly different angle, it does not retract or change the following circumstances which tie Morrison into the robbery beyond question:

1. Morrison and McDonald jointly purchased the Chevrolet Station Wagon to use solely for the trip from Midland to Big Spring and return on the occasion when the bank was robbed. They got rid of it promptly upon their return to Midland after the robbery. Morrison owned a Chrysler which could have been used for the trip except that it did not fit into their robbery plan.

2. Morrison furnished the business suit for McDonald to wear during the robbery and the brief case and the gun to be used.

3. Morrison drove McDonald from Midland to Big Spring and let him out within about a block of the bank. Morrison knew McDonald had his hair dyed and had on a suit that could not easily be traced to him.

4. McDonald could not have pulled the job as smoothly as he did without some knowledge of the setup at the bank. He had never "cased" the bank or even been in it before the robbery. Under the plan, he had to know that the President had a private office, even though the bank was a small one, and that the President kept his car at the bank.

5. Morrison would not have acted as he did in the clandestine rendezvous with McDonald at the Gibson parking area if he had not been implicated.

6. Morrison knew McDonald made the change in the car from the business suit to Levis and an old shirt after Morrison had seen McDonald at Gibson's.

7. Morrison made arrangements for a place where McDonald could wash the dye out of his hair before they drove back to Midland.

8. Morrison had McDonald leave Morrison's business suit at his friend's house rather than risk taking it back to Midland in the car with them.

9. Before the robbery, Morrison was short of cash. Just after it, he was "plush" for a man of his standing.

McDonald was a West Virginia state prisoner at the time he and Morrison were sentenced in May, 1968. After Morrison's trial, he was returned to the state penitentiary in West Virginia. Nothing was heard from him in regard to his testimony while he was there. In August or September, 1968, he was taken to Del Rio, Texas, where he and Morrison were facing a joint federal court charge of smuggling marihuana. He and Morrison were in the same portion of the Del Rio jail where they could talk

---

6. "Pills", as used by McDonald, was the vernacular for stimulant drugs such as are regulated by the Food, Drug and Cosmetic Act. 21 U.S.C. § 360a makes it a misdemeanor for any person other than those listed therein to sell or dispose of such drugs.

to each other for several weeks. While they were so situated, McDonald made a one page written statement saying in effect that his testimony implicating Morrison was false and that he committed the robbery without Morrison's knowledge or assistance. Morrison's case was on appeal, but he filed a motion for new trial alleging newly discovered evidence on the basis of McDonald's written statement. Both Morrison and McDonald were brought from Del Rio to Abilene for a hearing on the motion for new trial.

Before the hearing on October 3, 1968, Mr. Mack, Morrison's court appointed attorney, requested an interview with McDonald with his lawyer and counsel for the government present. Such an interview was held, and McDonald told Mr. Mack and the others present that his testimony on Morrison's trial was true and that his written statement of recantation was false. He said that the statement was involuntarily made. He thereupon wrote upon the statement which was then attached as an exhibit to Morrison's motion for new trial the following in his own words:

"I would like to withdrawl (sic) this statement, it is not the truth, what I said before on the witness stand was the truth as I know it. I was promised a lawyer for West Virginia charges and was under duress, at the time I wrote this statement above."

When McDonald was later called by Morrison as a witness on the hearing of the motion for new trial, Mr. Thomas, McDonald's court appointed attorney, said that he had had a conference with McDonald in jail shortly after McDonald arrived in Abilene for the hearing on the motion, and that McDonald had informed him the written statement "was made under duress and that it was wholly untrue; that the testimony he made under oath in this court back on the 20th of May in the trial of this case was the truth." After referring to the subsequent conference with McDonald and Mack present, the following occurred:

"MR. THOMAS: And comparing his conversation with the conversation I had with him and the conversation had with the government's attorney, I think he told approximately the same story, that this statement was made under some form of duress, and that it wasn't true and isn't true; and that his testimony, of course, as originally given, was not perjured testimony, but that it was the whole truth, and that this statement is false.

"THE COURT: Mr. McDonald, do you agree with your lawyer's statement? I do not want to invade your privilege. Do you object to his answering that question?

"MR. THOMAS: No, sir.

"THE COURT: Do you agree with the statement Mr. Thomas just made?

"DEFENDANT McDONALD: Yes, sir."

McDonald claimed his privilege against testifying. Counsel for Morrison stated that he did not see how the Court could force McDonald to testify, and the witness was excused. After other evidence was heard, the motion for new trial was overruled. Counsel for Morrison had the record of the proceedings prepared and forwarded to the Court of Appeals for consideration in connection with Morrison's appeal from his conviction. The appeal was dismissed at Morrison's insistence on February 5, 1969. (No. 26235, Morrison v. United States).

Morrison and McDonald continued to be together in custodial institutions for a long period following the hearing on the Morrison's motion for new trial. They were returned to the jail at Del Rio immediately after the hearing. They then filed motions for psychiatric examination, and were sent to the federal institution at Springfield, Mo. for such examinations. They were together all the time there, and during that period McDonald filed two typewritten in-

struments in the federal court at Abilene. One was a motion to vacate his conviction on the ground that his plea of guilty was involuntary. The other was a civil action petition suing his court appointed attorney, Mr. Thomas, and the Assistant United States Attorney, Mr. Florence, for $250,000.00 each on the ground that they had wrongfully induced him to swear falsely on Morrison's trial to facts implicating Morrison in the robbery. The psychiatric staff at Springfield found both Morrison and McDonald mentally competent, and they were returned to the Marshal of the Western District of Texas to be held for trial on the marihuana case in Del Rio. They were together for weeks in federal custody in the jails at San Antonio and Del Rio. McDonald took the fall on the marihuana case and Morrison got out of it. McDonald was then brought to Abilene on his way back to the penitentiary for a hearing on his post-conviction motion.

When McDonald reached Abilene, new counsel was appointed for him. At the time the matter was called for hearing, he appeared with his counsel and said that he wanted to dismiss that action and his civil suit against Mr. Thomas and Mr. Florence. He said, however, that he wanted to make a statement to become a part of the court record. He thereupon said that he had falsely sworn that Morrison was implicated in the bank robbery. His two cases were dismissed as he requested, and he was returned to the state penitentiary in West Virginia. He remained there until he was brought back to Abilene on a writ

for this hearing on Morrison's Sec. 2255 petition.

In Newman v. United States, 5 Cir. 238 F.2d 861, 862 (1956), our present Chief Judge Brown recognized that, " * * * persons who, as participants co-conspirators, or actors in the criminal activity initially charged, might *from a variety of base motives, or importunities,* be impelled, by recantation, to come to the aid of a person whose conviction has been brought about by their testimony, confident, as experienced criminal litigants, that the unusual difficulties in successful prosecution for perjury would expose them to no real peril." (Emphasis added). He went on to say in footnote 1 of the opinion that: "Recantation is 'looked upon with the utmost suspicion,' Harrison v. United States, 2 Cir., 7 F.2d 259, 262. * * *"

It is not necessary to resort to inference to determine whether there were base motives or importunities here. They were proved by statements McDonald made to several people, by the notation he put on the bottom of his written recantation,[7] and by his admissions in open court.[8] He told Deputy Marshal Black that the reason he recanted was because he had to be able to say when he got back to the West Virginia penitentiary that he had gone on record in a court retracting his testimony incriminating Morrison. He said that "squealers" were in danger at that penitentiary; and that in the few months he had been there since Morrison's trial, two men who had testified as witnesses for the prosecution had been murdered and another one had been stabbed in the back.[9] He

7. This reference is to the notation heretofore quoted where McDonald said that the recantation was procured by promises and under duress.

8. One of these instances appears in the portion already quoted from the proceedings on Morrison's motion for new trial on newly discovered evidence. Others will be identified later in the opinion.

9. The following is quoted from Mr. Black's testimony on the present hearing:
"Q (By Mr. Mahon) Now, Mr. Black, have you had occasion—just in the last

few days preceding this hearing, to have any conversation with Joe McDonald?
"A Yes, sir.
"Q When and where did you have a conversation with him on these occasions?
"A I believe on Monday afternoon he was in the holdover cell and he called me and wanted to ask me a question.
"Q And what was that question?
"A His first question was—he made a request of me earlier, last week I believe, on Thursday or Friday—Friday, I believe, to get to talk to Judge Brewster and ask him for assistance in determining

also told Mr. Black that an additional reason for his recantation was that Morrison had promised that if he could get out, he

how his federal time was running with his state time.

"THE COURT: You mean whether it was running concurrently?

"A Yes, sir, whether it was. And he wanted to know last Friday if I would see if the Judge would discuss it with him, and on Monday afternoon, if the Judge would discuss it. And I advised him that the Judge would not have any private discussions with him on that or anything else.

"THE COURT: Excuse me. Did he make the request that he discuss it in my office or somewhere else, or was anything said about that?

"A Well, no, sir, he just wanted a chance to talk to the Judge in private about it. That was his original request.

"THE COURT: By discussing it in private, he meant in the office?

"A In the office. And then he reiterated that he hated it he had caused all this trouble, but that he had to do this; had to get it in the record that he had perjured himself so that he wouldn't be killed in the penitentiary.

"Q Did he tell you that on Monday of this week?

"A Yes, sir.

"Q Where were you when he told you that?

"A In the office, and he was in the holdover cell.

"Q Did he relate to you any other incidents in which this had happened to people who had testified against co-defendants, or for the government, or something?

"A On last Friday when I had gone to the county jail with Morrison's attorney, Charles Scarborough, to interview McDonald, he had related at that time of two instances in the West Virginia penitentiary a few days before he left there where there had been two inmates killed for squealing, and another one that they were afraid he was going to be killed, so they put him in isolation, or put him down in the hole to protect him; and still other inmates got to him and cut him up. And at the time he left there, they didn't know whether he was going to live or die."

\* \* \* \* \*

"Q (By Mr. Mahon) Now, then, was there any later discussion with McDonald concerning this matter?

"A Since Monday?

"Q Yes, sir.

would employ a lawyer to get McDonald's convictions set aside.[10] He made the same statements as to his reasons to his

"A No, sir.

"K Monday is the time then that he told you he had to get this on the record?

"A Monday was one time. Now, Mr. Mahon, I have handled him in and out of the jail and to and from the San Angelo city jail to this jail numerous times since the time he was originally picked up. And since the date that he has made this statement in the Del Rio jail saying he perjured himself, and later when he retracted it here, he has told me no less than five or six times that he had to get it on the record that he had perjured himself and that he lied against Morrison, or otherwise he would be killed in the penitentiary by other inmates, or that Morrison would have him killed by some of his friends either in the penitentiary or out of the penitentiary, because of this grapevine that gets around the penitentiaries, that a squealer will be killed, or will be taken care of either in or out of the penitentiary; and he had to do it.

"Q Mr. Black, how long have you been involved in law enforcement?

"A 16 years in this particular position and 10 years prior to that in other jobs.

"Q Do you know of your own personal knowledge by reason of your 25 years association with law enforcement that inmates in the penitentiary have a dislike for anyone who squeals?

"A Yes, sir.

"Q Is it against their code of ethics, among the underworld, among the convicts, that when one squeals on another, there is going to be some action taken?

"A Yes, sir.

"Q And regardless of whether the inmates know the party on whom he squealed or not?

"A If he is a squealer, it doesn't make any difference who he squealed on or where, he is marked for death.

"Q And this is general knowledge among inmates?

"A Yes, sir.

"Q And it is general knowledge among law enforcement officers?

"A Yes, sir."

10. In this connection, Mr. Black testified on the present hearing:

"Q (By Mr. Mahon) Yes, sir, what, if anything, did you hear Mr. McDonald say at the time he made the entry in his writing there on Plaintiff's Exhibit No. 2? [His original written statement of recantation]

lawyer, Mr. Thomas.[11] McDonald admitted in his testimony on this hearing that he had made such statements to Black and Thomas, but insisted that he was not afraid of anybody. Some of his testimony on this hearing casts doubt on his lack of fear.[12] He further testified that harm could come to a "squealer"

> "A Well, he did say about the same thing he stated here, that—giving his reason for making this statement, that he had been promised—
>
> "Q —Did you hear him give his reasons?
>
> "A Yes, sir.
>
> "Q What were his reasons?
>
> "A Well, he said it looked like he was stuck in jail for a long time. And he got down to Del Rio and Morrison had convinced him that if he would make this statement, that he would get him a lawyer—that Morrison could get out on bail pending a new trial and then he could raise some money and he would hire him some lawyers and get him out of the penitentiary in West Virginia. And he said, 'I believe him'. And he said, 'Even though it wasn't true, I didn't know it would come to this, that I would be brought back up here.'
>
> "He thought if he signed the statement, that would get Morrison, or Rip, out on the ground and then he could get loose in West Virginia."

11. The following is quoted from Mr. Thomas' testimony on the present hearing:

> "But after a considerable conversation, I said, 'What prompted you to change your testimony or want to change your testimony?'
>
> "And he gave two or three reasons for it. The first one was that—I think it goes back to the same old problem on the source situation as far as jails and that sort of thing. And of course Morrison is a very persuasive character. He was there under his immediate influence.
>
> "But the big thing was that Morrison had told him that he had a source of money and that if he would change his testimony that he would guarantee him that he would have the best lawyers that money could buy in West Virginia. And he had convinced Mr. McDonald that those convictions in West Virginia would be set aside."
>
> *       *       *       *       *
>
> "And that was, in my opinion, the big thing of it all, was that Morrison had actually convinced him that he could get the state convictions set aside. And the fact that he might be treading on soft ground going to the penitentiary and being the type of fellow that might have testified against another man, you know.

> "THE COURT: Did he discuss that phase of it with you?
>
> "A Yes, sir.
>
> "THE COURT: What did he say about that?
>
> "A Well, of course, he has always maintained that he has no fear whatsoever, physical fear, of Mr. Morrison.
>
> "THE COURT: I mean though about going back. You said something about going back to the penitentiary.
>
> "A Of course, he did mention the fact that it could be bad for him. Of course, he was not only in Del Rio, but I believe they were incarcerated some together in San Antonio.
>
> "THE COURT: And in Springfield.
>
> "A And in Springfield. In other words, they were together maybe other than just at Del Rio. And that, like he said yesterday, it does get around, and that he thought maybe he might wind up with a shiv in his back somewhere down the line."
>
> *       *       *       *       *
>
> "And, just like I say, he was just convinced 100% in his mind that that would be done, that the minute Morrison gets on the ground—those were his words—that he will be out of the West Virginia penitentiary in 60 days. He was convinced of that."

12. The following quotations are from McDonald's testimony on the present hearing:

> "Q (By Mr. Mahon) You related, didn't you, on an occasion in the jail to people in Taylor County, to the authorities of this county that just recently two people were killed in the penitentiary who testified for the government, isn't that correct?
>
> "A No, sir, I didn't say for the government. They was known to have told something on someone.
>
> "Q Oh, all right. In other words, but you have told people since you have been here that two people were killed in the penitentiary who had squealed on someone?
>
> "A Yeah.
>
> "THE COURT: Was that in the West Virginia penitentiary where you are?
>
> "A Yes, sir.
>
> "THE COURT: All right, go ahead.
>
> "Q And you also told them that another person was seriously injured by

serving a term in the penitentiary, even though the man he testified against was not there. He said the man injured by the testimony seldom had a hand in the murder of a "squealer".[13] It is just the code that "squealers" are taken care of.

Another persuasive factor in believing that McDonald's testimony on Morrison's criminal trial was true is that it was the same story he told the F.B.I. Agent who answered his call at the West Virginia penitentiary and Mr. Thomas, his court appointed attorney. McDon-

ald admits this. The Agent knew nothing about the case. McDonald had no reason to talk to him unless he was going to tell the truth. Mr. Thomas had never seen McDonald before their first interview in the jail. That interview was a lengthy one and Thomas made copious notes. He still had the notes when he testified on this hearing. He said that McDonald's story to him in that first interview was the same that he told during his testimony, and that the notes so showed.

being knifed because they had squealed on somebody, is that correct?

"A Yes, sir.

"Q And this did happen in the West Virginia penitentiary?

"A Yes.

"Q Where you are stationed—where you are confined?

"A Yes, sir.

"Q And it just happened recently?

"A Yes, sir."

*     *     *     *     *

"THE COURT: Why did you want to get it off your record that you testified against someone?

"A Because that is bad any way you go.

"THE COURT: You mean in the penitentiary?

"A Anywhere. On the street or in the penitentiary.

"THE COURT: How do you mean it is bad?

"A Well, it is just—

"THE COURT:—Do you mean among the people who are serving time it is bad?

"A Yeah.

"THE COURT: And in what way is it bad?

"A Well, it is just—well, they don't trust you. And if anything goes wrong, they come to you and say, 'Well, you snitched on us', if it is known you have already testified against someone. And it is just bad, you know.

"THE COURT: Are you likely to have something happen to you? Is it possible?

"A It is possible but not probable.

"THE COURT: You say they can make it unpleasant for you?

"A Yeah. But they don't make it unpleasant for me.

"THE COURT: How does that word get around? People talk about grapevine, but how does it get around when you squeal on somebody?

"A Well, jailers, sheriffs, records, prisoners from one penitentiary to another.

"THE COURT: Like it would be on your record in the West Virginia penitentiary that you had testified as a witness in this case?

"A Yeah. Yes, sir.

"THE COURT: Then somebody, either an official in the penitentiary or—

"A—A trusty—

"THE COURT:—Or trusty might spread that word?

"A Yes."

*     *     *     *     *

"THE COURT: Did you have any conversation with him [Mr. Black] about Morrison having cronies that were in and out of the penitentiary?

"A I said that Marvin Morrison knows a lot of people and had a lot of friends.

"THE COURT: Did you say anything about them being in and out of the penitentiary all of the time?

"A No, sir, I didn't.

"THE COURT: When you mentioned he had a lot of friends, did you mean among the underworld?

"A Well—

"THE COURT:—Any people in trouble?

"A Well everywhere, yes, sir.

"Q (By Mr. Mahon) The people that —the friends you were talking about to Mr. Black, some of them could be in the penitentiary, and some of them could be out?

"A Yes, sir.

"Q You don't mean they were in or out?

"A Yes, sir, I don't mean that.

"Q And you meant that these people could cause you some harm if they knew you had squealed on Morrison?

"A They could, yes."

13. He did not amplify this. A reasonable inference would be that it would be more difficult to identify the killers if the person convicted by the testimony did not participate in the killing.

McDonald never could get settled on his motive for giving perjured testimony against Morrison. On this trial, he said it was because he disliked Morrison and wanted to put him out of the way. Morrison tried to intimate in his questions to McDonald that it was because McDonald wanted his "wife", Dollie.[14] In McDonald's civil suit against Thomas and the Assistant United States Attorney, he said they knowingly induced him to give the perjured testimony. On this hearing, he said they never asked for anything but the truth.

It is obvious that Morrison high-pressured McDonald to recant. The jail in Del Rio was a perfect setting for Morrison to begin on McDonald. On this hearing, McDonald testified that the fellow prisoners in their section of that jail were facing smuggling and narcotics charges.[15] McDonald was only about 20 years old. He was of just average intelligence and was immature for his age. Morrison was in his later 30's and his long experience in crime had matured him. He dominated McDonald. He was cunning and conniving. He never let up on anything until he got what he wanted. He was a constant source of harassment while he was in the jail at Abilene. Immediately following the arraignment in the robbery case, McDonald asked to be taken back to the San Angelo jail instead of being kept in the Abilene jail with Morrison. He wanted to get away from Morrison's harassment. McDonald told the F.B.I. Agent in the first interview in the West Virginia penitentiary

that Morrison was sadistic. On the present hearing, he admitted making that statement, but he said it was incorrect. He did testify, however, " * * * he [Morrison] could be extremely dangerous if he had a good reason." McDonald never wrote a letter or a pleading. His near illiteracy shown in his notation on the bottom of the written statement of recantation makes it appear that it is highly unlikely that he could write anything much. Morrison, on the other hand, is a prolific writer. Many of the instruments signed by McDonald appear to be in Morrison's handwriting. Morrison did have an exact copy of everything McDonald signed in connection with all these proceedings. It is obvious that this recantation is a pure frame-up by Morrison and that McDonald is going along with him on it.

There is not enough merit in the issue presented by this record to justify this detailed discussion. The question presented is only one of fact for the trial court. Newman v. United States, supra, 238 F.2d at page 863, where the following is quoted with approval from Gordon v. United States, 6 Cir., 178 F.2d 896, 900 (1949), cert. den. 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353:

" * * * If the District Judge, on the basis of the whole record of the original trial and the matters presented on the hearing of the motion, believes the statements in the affidavit of recantation to be false and is not reasonably well satisfied that the testimony given by the witness on the trial

14. That would be hard to believe where McDonald had 25 years to do in the penitentiary when he first gave the information about the bank robbery.

15. McDonald testified on this hearing:
"THE COURT: Now in the Del Rio jail, what kind of prisoners were there mostly? Are there many prisoners there for narcotics smuggling and things like that?
"A Yes, sir, that is usually what is there.
"THE COURT: What I am getting at, would it usually be a pretty rough class of men in jail there?

"A Well, they are desperate.
"THE COURT: That is what I mean, desperate men?
"A Yes, sir.
"THE COURT: Like you would expect from dope peddlers and dope smugglers?
"A Yes, sir.
"THE COURT: Is that the kind of men you and Morrison were in jail with down there?
"A Yes, sir."

was false, the decision is for him to reach for he is 'not at liberty to shift upon the shoulders of another party his own responsibility, but [is] charged with the responsibility to seek the truth himself * * *.' "

■■ This Court, from observing McDonald during his testimony on Morrison's trial and on this hearing, and taking into consideration the credibility factors usually relied upon by the trier of facts, believes that McDonald's recantation is false and that his testimony on the original trial was true. That alone would be sufficient ground for denying the motion to vacate. Other grounds appearing herein which have been held to be a sufficient basis in themselves for refusing to set aside a conviction on the ground of recantation by a witness for the prosecution are that the witness at some time repudiated his recantation, Maldonado v. United States, 9 Cir., 325 F.2d 295, and that the recantation was conceived under suspicious circumstances, Martin v. United States, 5 Cir., 17 F.2d 973, 976, cert. den. 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408, cited with approval in Newman v. United States, supra. Morrison will be filing motions to vacate as long as he is in the penitentiary. The threat in his letter of January 20, 1969 heretofore mentioned about "bombarding" the courts was not just idle talk. All of the transcripts of all prior proceedings relating to the connection of Morrison and McDonald with this bank robbery were offered in evidence in this case. They are in a number of separate documents and at least one of them is lengthy. All together, they are voluminous. The author of this opinion presided at all those hearings, and deems it advisable to summarize those proceedings while they are fresh on his mind for whatever value they may have in future post-conviction proceedings involving this petitioner.

While it is not a proper issue in a proceeding of this kind, the Court, for the purpose of making the picture complete, will comment briefly on Morrison's complaint about the fact that he received a sentence of 25 years while McDonald got only 15.

Morrison masterminded the robbery. In pursuance of his instructions the victim, an elderly man, was cruelly beaten over the head with a pistol. He is a recidivist with a rap sheet five pages long showing that he has been to the penitentiary three separate times. His prior convictions include two for robbery. He will be a menace to society as long as he lives.

McDonald, the co-defendant, pleaded guilty and testified as a witness for the government. He was young and acted under the domination of Morrison. He would not have committed the offense except for Morrison. He appeared truly repentant at the trial. He had voluntarily sent for the F.B.I. and given them the information necessary to clear up the case when they had no idea who was involved in the robbery. While he strayed far from right after he came under Morrison's influence, the Court had the impression at the time that he might have some good in him, if it could be reached.[16]

The Court is of the opinion that the petitioner's motion to vacate should be denied. Judgment will be entered accordingly.

This opinion will serve as the findings of fact and conclusions of law.

---

16. This Court has never followed the practice of giving a defendant a lighter sentence as a reward for testifying as a government witness. If the Court is convinced that the witness is truly repentant and is doing his best to right a wrong, that is taken into consideration. There have been cases in this Court where the ringleader of a group of defendants testified for the government and got more than any of the other defendants because the Court was convinced that his degree of culpability was greater. See for example, United States v. Spencer, 5 Cir., 412 F.2d 798 (1969), where the defendant testifying as a government's witness got twice as much time as either one of the other defendants.